100 N.J. Super. 107 (1968)
241 A.2d 259
GLADYS KRUVANT, PLAINTIFF-RESPONDENT,
v.
NORMAN S. KRUVANT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1967.
Decided March 18, 1968.
*110 Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. Ronald G. Targan argued the cause for appellant (Messrs. Schechner and Targan, attorneys; Mr. Ralph Neibart of counsel).
Mr. Richard L. Amster argued the cause for respondent.
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendant Norman S. Kruvant appeals from two orders of the Chancery Division reopening and modifying the provisions for the support of his son, Michael Kruvant, as contained in the judgment nisi for divorce in this cause.
Plaintiff and defendant were married in Newark, New Jersey, on February 12, 1939. Three children were born of the marriage, Michael (born July 4, 1941), Ronald and Arni Beth. A judgment nisi awarding plaintiff a divorce on the ground of desertion was entered on April 29, 1958 and became final on July 30, 1958 (Docket No. M-2359-57). Both parties thereafter remarried. Plaintiff now resides with her new husband and her daughter Arni Beth in Maplewood, New Jersey, while defendant resides with his new wife and her two children of a prior marriage, in North Miami, Florida.
The judgment nisi adopted an agreement between the parties which provided that the wife was to have custody of the three children and to receive weekly payments of support for the children and herself. If she remarried, the children's payments were to be increased by 20%. The payments were to continue even if defendant predeceased the children. To the extent here pertinent, the agreement also provided that payments for the children were to continue until "they and each of them have reached maturity as recognized in New Jersey and [are no longer] entitled to receive support from parent." They were to continue "notwithstanding any independent income that said * * * child may receive from *111 any source whatsoever." There was also a provision that plaintiff and each child of the marriage "shall have the opportunity * * * to be enabled to put aside as savings any moneys to protect said * * * infant children against any unforeseen and unhappy emergency" and that the provisions in the agreement were "in addition to and notwithstanding any separate income received by the wife and said children."
Defendant interpreted the agreement as permitting the termination of payments under the judgment nisi as each child reached the age of 21. When Michael and Ronald attained that age, he discontinued the payments even though he "voluntarily" continued to aid each financially.
On September 12, 1966, plaintiff filed her present motion to reopen the judgment in the divorce action to modify the provisions for the support of Michael, who was then 25 years old, and to compel reimbursement to her for monies already expended in his behalf. In her moving affidavit she alleged that he suffered from an emotional illness or mental disorder which had pre-existed the divorce and had continued during his minority. It had become so bad during the 1963-65 period that it had been necessary to summon the East Orange Police (Michael was then living there) on six occasions, two of which resulted in his hospitalization. She also alleged that he had required "constant psychiatric treatment" and had been at one time hospitalized at the Carrier Clinic, a private mental institution located at Belle Mead, N.J.
It was further alleged that by the latter part of 1965 Michael had withdrawn from all interpersonal relationships, had lost weight and was suffering from depression and blackout spells. He had been unable to complete his college education or obtain employment and generally demonstrated an inability to function normally in society. She thereupon arranged for Michael's hospitalization at the Institute of Living, an internationally recognized private psychiatric institution at Hartford, Connecticut, where he had been a patient from December 8, 1965 until the date of her moving papers (he continued there through December 1966). The basic *112 cost of maintenance and treatment there was $245 per week and plaintiff had expended a total of $12,821.12 for that purpose up to December 1, 1966.
She alleged that she had been advised by the Institute's staff that the type of individualized treatment that Michael's condition required was not available at State or county psychiatric institutions. The diagnosis was "depression reaction in a passive-aggressive personality, passive dependent type." In September 1966, the psychiatrist-in-chief there reported that:
"Michael Kruvant has a history of withdrawal from interpersonal relationships, inability to complete his college education or to obtain gainful employment, depression and an apparently severe characterologic problem involving overuse of medication. He continues to manifest this type of adaptation although in a somewhat improved manner as compared to the time of his admission."
It was his opinion that if Michael were to leave the hospital at that time he would be unable to function either in a college or occupational setting.
Plaintiff alleged that at the time of Michael's hospitalization she had sought defendant's assistance in financing his hospitalization, through defendant's former attorney. It is not claimed that defendant approved, or even that he personally knew that Michael was being hospitalized. She alleges that it had been suggested on defendant's behalf, as an alternative, that Michael would be better off in a State operated mental institution such as Overbrook Hospital in Cedar Grove and an offer had been made on his behalf to arrange for Michael's admission there.
In the absence of financial aid from defendant, plaintiff averred that, although she had managed up to then to pay for Michael's hospitalization at the Institute through personal funds and by borrowing from other sources (including the bank accounts and bonds of Michael, Ronald and Arnie Beth), she was no longer able to carry the burden.
*113 At the time of the hearing on the motion Michael was scheduled for release from the Institute and was to be treated thereafter on an outpatient basis, thus substantially reducing the cost of his care. At the oral argument we were advised that he was no longer under treatment.
Almost simultaneously with the present motion plaintiff instituted a separate action in the Chancery Division seeking the same relief upon substantially the same allegations. At the hearing on the motion counsel for plaintiff offered to consolidate the latter action with the motion, but this offer was not accepted by the trial judge and he proceeded on the motion alone. However, he commented:
"If the case goes on appeal and the Appellate Division or Supreme Court should decide I was wrong on going on the Notice of Motion, I am sure they will take up the Complaint just as if it had been carried through on the same testimony."
The motion to reopen was heard on the affidavits of the parties, supplemented by the testimony of defendant as to his assets and that of Dr. Samuel Martin, a psychiatrist connected with the Essex County Probation Department. The latter testified that Michael could be adequately treated at Overbrook but conceded that care at the Institute would be better. The motion was resisted on the grounds, substantially, that (1) defendant was no longer obligated to maintain his adult son, (2) if such obligation existed, it could not be enforced in the present proceedings and (3) he should not be required to pay for Michael's care in the Institute at $245 a week when adequate care was available at Overbrook at $68.74 a week.
In a letter opinion dated December 7, 1966 the trial judge found defendant financially able to pay and directed him to assume the cost of Michael's hospitalization at the Institute from December 1, 1966 onward. He subsequently concluded that both plaintiff and defendant were liable for the cost of Michael's care up to December 1, 1966 and directed that plaintiff be reimbursed by defendant for one-half of the *114 amount already paid by her for that purpose. Concomitant judgments were entered from which the present appeals were taken.
In essence, the issues presented are:
(1) May the divorced father of an adult child be required as a matter of common law to contribute to the hospitalization and custodial care of such child brought about by mental illness which pre-existed the child's attainment of his majority?
(2) May an obligation of that nature, under the particular facts here presented, be enforced in the present proceedings to modify the provisions for support embodied in the judgment nisi?
(3) If the answer to (2) is in the negative, may such relief be granted in the absence of a plenary hearing?
(4) Assuming that it may, do the facts support the orders appealed from?
We proceed to their consideration in that order.

I
It is clear that if Michael had been confined to a public institution for the insane or feeble-minded or found eligible for public welfare payments, defendant could have been required to contribute to his care. In the former situation N.J.S.A. 30:4-60 and 66 authorize proceedings to compel the father of an insane child to contribute to his care and R.S. 30:4-176 makes similar provision for an indigent feeble-minded child. Likewise R.S. 44:1-140 makes the father and mother of a child not able to work responsible for his maintenance where the child is likely to become a public charge. Here the issue is whether defendant may be required as a matter of common law to contribute to Michael's support by way of medical care in the absence of his confinement in a public institution or his becoming a public charge.
We find no New Jersey precedent which is dispositive of the issue. The trial judge found Dept. of Mental Hygiene, *115 State of Calif. v. Judd, 45 N.J. 46 (1965) and Cohen v. Cohen, 6 N.J. Super. 26 (App. Div. 1949) to be relevant.
In Judd, the California Department of Mental Hygiene sued in the Sussex County Juvenile and Domestic Relations Court under the Uniform Reciprocal Enforcement of Support Act (see N.J.S. 2A:4-30.1 et seq.) to compel Judd, a New Jersey resident, to contribute to the maintenance of his adult mentally ill son, Arthur, in public institutions in California. A judgment holding him liable was certified by the Supreme Court. Since an intervening California decision had declared the statute on which California's claim for contribution was based to be unconstitutional, thus precluding any such action against a California resident, the court held that it could not be maintained against Judd, a New Jersey resident. In response to a suggestion that the pleadings in the case be molded to set forth a cause of action under any applicable New Jersey law holding a parent liable, the court pointed out that the common law in New Jersey recognized the general absence of liability on the part of parents for the maintenance of their adult children and found there was no necessity to pursue the issue of Judd's liability further because "assuming that New Jersey would, independently of its statutes [such as N.J.S.A. 30:4-60 and 66] and under appropriate circumstances, recognize a common law responsibility on the part of a parent to maintain an adult child," it was unnecessary to recognize it under the circumstances presented.
In Cohen v. Cohen the divorce decree had provided that the wife retain custody of their only child, then six years of age, and that the husband pay $5 a week for the latter's support. Seven years thereafter the wife sought an increase in the weekly payments, based primarily upon the former husband's more prosperous condition. The increase was allowed and the husband appealed. Although the proceedings had been brought under R.S. 2:50-37 (now N.J.S. 2A:34-23), the court was not called upon to determine whether the father's obligation of support would continue beyond the date *116 on which his daughter attained her majority. However, Judge Bigelow noted in his opinion:
"Ordinarily, the obligation of the parent to support ends when the child reaches full age, although it might continue indefinitely if the child were crippled or unable to support himself. In many cases, the obligation terminates when the child is around 18 years. Ames v. Ames, 4 N.J. Eq. 171 (Pennington, C., 1842); Snover v. Snover, 13 N.J. Eq. 261 (Green, C., 1861); 1 Blacks, Com. 449. It is probably safe to say that when the family situation is such that, had there been no divorce or separation, the child would have gone to work and become self-supporting before attaining age 21, the duty of the parents under the statute likewise terminates while the child is still a minor. On the other hand, in a family where a college education would seem normal, and where the child shows scholastic aptitude and one or other of the parents is well able financially to pay the expense of such an education, we have no doubt the court could order the payment." (at p. 30) (Emphasis added.)
We are satisfied that the emphasized portion of the cited opinion is in accord with the weight of authority in other jurisdictions, at least as a matter of common law. See Annotations, "Adult Child-Support," 1 A.L.R.2d 910, 921 (1948) and "Child Support Decree-Modification," 89 A.L.R.2d 7, 90 (1963).
The facts sub judice somewhat resemble those in Wells v. Wells, 227 N.C. 614, 44 S.E.2d 31, 1 A.L.R.2d 905 (Sup. Ct. 1947) where the wife sought to recover for expenses incurred by her in the maintenance of her son who was, prior to and since attaining his majority, mentally and physically incapable of earning a livelihood. In holding that the complaint set forth a cause of action against her husband, from whom she was living separate and apart, the court held:
"Ordinarily a child, in the eyes of the law, is in a condition to provide for his own maintenance when he has reached the age of twenty one years, that is, has attained the status of majority. That age was arbitrarily fixed at common law for the termination of the child's minority, and the attainment of his majority, and the rule has remained in force throughout the United States. 27 Am. Jur. 748, Infants 5. However, as stated by Fullerton, J., in Springstun v. *117 Springstun, 131 Wash. 109, 229 P. 14, 15, 40 A.L.R. 595, `Majority or minority is a status, rather than a fixed or vested right * * * the rule was arbitrary in the sense that it was one of convenience and necessity, as distinguished from a substantive rule of law.'
Therefore, if a child be so defective in mind or in body as to be incapable of providing his own maintenance when he reaches the age of twenty one years, the rule does not remove the disability and has no application to the status of the child.
Moreover, the child may have the same need of support, care and maintenance after reaching that age as before. If so, does the obligation of the father to provide necessary support to such child terminate at that time? The dictates of humanity, which the law follows, answer `No.'"
Additional cases so holding are collated in Borchert v. Borchert, 185 Md. 586, 45 A.2d 463, 162 A.L.R. 1078 (Ct. App. 1946) where the court found:
"* * * it must be concluded, in view of the many decisions so holding, that there is now a tendency in this country, whether based upon local statutes or upon a modern judicial expansion of the common law, to recognize a duty imposed upon a parent to support his incapacitated child. Among the cases discussing the subject are Cromwell v. Benjamin, Sup. 1863, 41 Barb. N.Y. 558: Alger v. Miller, 56 Barb. 227; Matter of VanDenburgh, 178 App. Div. 237, 164 N.Y.S. 966; Brown v. Ramsay, Sup., 1860, 29 N.J.L. 117; Breuer v. Dowden, 207, Ky. 12, 268 S.W. 541, 42 A.L.R. 146; Crain v. Mallone, 130 Ky. 125, 113 S.W. 67, 22 L.R.A., N.S., 1165, 132 Am. St. Rep. 355; Rowell v. Town of Vershire, 62 Vt. 405, 19 A. 990, 8 L.R.A. 708; Schultz v. Western Farm Tractor Co., 111 Wash. 351, 190 P. 1007, 14 A.L.R. 514; Halsted v. Halsted, 228 App. Div. 298, 239 N.Y.S. 422: Freestate v. Freestate, 244 Ill. App. 166; Rife v. Rife, 272 Ill. App. 404, 39 Am. Jur., `Parent and Child', pars. 68 and 69, pp. 710 and 711; Plaster v. Plaster, 47 Ill. 290; Howard v. United States, D.C.E.D. Ky., 2 F.2d 170."
The court determined, however, that the Maryland statute under which the proceeding had been brought was not sufficiently broad to confer jurisdiction to grant the relief sought. See also Commonwealth ex rel. O'Malley v. O'Malley, 105 Pa. Super. 232, 161 A. 883 (Super. Ct. 1932); Commonwealth ex rel. Nicholson v. Groff, 169 Pa. Super. 12, 82 A.2d 536 (Super. Ct. 1951) and Commonwealth v. Wingert, 173 Pa. Super. 613, 98 A.2d 203 (Super. Ct. 1953).
*118 From our consideration of the foregoing we conclude that where, as here alleged, an adult son of a divorced husband becomes so disabled as to be incapable of maintaining himself because of a mental illness or emotional disorder which pre-existed his attaining his majority, the husband may be required at the suit of the wife to contribute to the cost of his necessary care and maintenance. Wells v. Wells, supra; 67 C.J.S. Parent and Child § 17, p. 704 (1950); 39 Am. Jur., Parent and Child, § 69, p. 710 (1942); cf. Brown v. Ramsay, 29 N.J.L. 117, 120 (Sup. Ct. 1860); Wood v. Morris & Co., 2 N.J. Misc. 1010, 126 A. 434 (Sup. Ct. 1924); Cohen v. Cohen, supra. See also Halsted v. Halsted, 228 App. Div. 298, 239 N.Y.S. 422 (1930); Breuer v. Dowden, 207 Ky. 12, 268 S.W. 541, 42 A.L.R. 146 (Ct. App. 1925); Gaydos v. Domabyl, 301 Pa. 523, 152 A. 549, 554 (Sup. Ct. 1930).
In such an action the issue is the extent, if any, to which the husband should be required to contribute to the necessary care and maintenance of the disabled child. Subject to the rule stated in the paragraph below, his contribution should be "geared" to the fair cost of such care as the condition of the child's health renders necessary. The mere fact that the mother has elected, without the father's consent, to contract for care of a particular type which she considers to be necessary does not make it so. In determining the amount the father is to pay, the test is not whether the care for which she had contracted was the best care available but whether it was reasonably a necessity, having in mind the child's condition and the financial resources of all persons responsible.
As was here recognized by the trial judge in his second letter opinion, both father and mother are liable for the care of their child. Bruguier v. Bruguier, 12 N.J. Super. 350, 353 (Ch. Div. 1951). Further, in the case of an adult child his own resources should first be applied to the cost of his care. Thus the father should be required to contribute only such portion of the reasonable cost of the child's necessary *119 care as the court finds to be equitable and just after giving due consideration to the income and the assets of the child, his mother and father. Cf. Mowery v. Mowery, 38 N.J. Super. 92, 100 (App. Div. 1955), certif. denied 20 N.J. 307 (1956).

II
Defendant urges that the relief here granted exceeded the court's jurisdiction since N.J.S. 2A:34-23, on which the challenged orders were based, should be interpreted to refer to support for minor children only, citing Mowery v. Mowery, supra; Slep v. Slep, 43 N.J. Super. 538 (Ch. Div. 1957); Werner v. Werner, 7 N.J. Super. 229 (App. Div. 1950), and Roth v. Roth, 10 N.J. Super. 406 (Ch. Div. 1950). While the court in each of the cited cases held that the statute there in question conferred jurisdiction on the Chancery Division, in suits for divorce or maintenance, to make allowances for minor children, none of them dealt with the issue of whether the obligation of support would automatically terminate when the minor came of age in the event he was then so disabled as to be incapable of self-support.
The statute, N.J.S. 2A:34-23, has been interpreted as authorizing support for such time as the nature of the case and the circumstances of the parties render suitable and proper. Werner v. Werner, supra, 7 N.J. Super., at p. 230. It contemplates support for the children of divorced parents who, but for the divorce, would have continued to be entitled to the support of their father. It stems from the presumed inability of such children, by reason of their minority, to provide for themselves. Children who are unable to care for themselves because of their minority are no less entitled to the court's solicitude when they continue to suffer, after they have attained their majority, from a physical or mental disability which continues to render them incapable of self-support. Normal instincts of humanity and plain common sense would seem to dictate that in such *120 cases the statutory obligation of the parent should not automatically terminate at age 21, but should continue until the need no longer exists. 67 C.J.S. Parent and Child § 17, p. 704 (1950); 39 Am. Jur., Parent and Child, § 40, p. 645, § 69, p. 710 (1942). However, we do not believe that the Legislature in enacting N.J.S. 2A:34-23 intended to confer jurisdiction upon the court to compel a husband or wife to support a child suffering from a disability which did not exist at the time of his attaining his majority but came about some time later.
Nowhere in the moving papers before us does plaintiff allege that Michael was at the time of attaining his majority incapable of self-support because of his emotional illness. Although her initial affidavit indicates that the "onset" of Michael's trouble occurred when he was 15 years of age, the "severe emotional distress and complete blackouts which disabled him from functioning normally in society" did not occur until the latter part of 1965, when he was 24. Prior to that time and after attaining his majority Michael had not been living at home but had his own apartment. He also appears to have taken a trip to Europe, had at least two jobs and attended a variety of schools after he became 21. We are therefore satisfied and hold that, on the basis of the record presently before us, the court was without statutory jurisdiction to reopen and modify the judgment nisi for the purpose of enforcing defendant's alleged obligation to contribute to Michael's care. Once defendant's liability under the judgment had been terminated (here when he became 21 and was not then disabled), it could not be restored. 67 C.J.S. Parent and Child § 17, p. 704 (1950); 24 Am. Jur., Divorce and Separation, § 832, p. 943 (1966); Annotation, "Divorce-Support of Adult Child," 162 A.L.R. 1084, 1090 (1946). Any obligation arising thereafter could be asserted only in a separate action. See Van Tinker v. Van Tinker, 38 Wash.2d 390, 229 P.2d 333, 334-335 (Sup. Ct. 1951). In such action Michael, as well as his father and mother, should be represented.

*121 III
In view of the foregoing, we are in agreement with defendant's challenge to the procedural inadequacy of the hearing afforded him, even if considered in the context of a common law action to compel him to contribute to Michael's care. The issues posed by the application were separate from those involved in the original divorce case and entirely new to the court. Considerations of due process, as well as the spirit of the rules, called for a plenary trial rather than a hearing on affidavits. Cf. Testut v. Testut, 32 N.J. Super. 95, 102 (App. Div. 1954). We are satisfied that the omission to afford defendant a trial on oral proofs placed him at a substantial disadvantage and has left us with a wholly inadequate factual record. The proofs consist of plaintiff's affidavits (which contain much of a conclusory nature), defendant's affidavit, the testimony of defendant as to his income and assets and some testimony by Dr. Martin (who had never treated Michael and had only seen him once). The trial judge relied upon an unverified letter from a doctor at the Institute of Living as to Michael's diagnosis. There were inadequate proofs and no findings as to the financial resources of either Michael or plaintiff. No facts were adduced and no reasons advanced to explain the inconsistency between the judge's holding that defendant was liable only for one-half the amount plaintiff had expended for Michael's care prior to December 1, 1966 and his order that defendant pay the entire cost of such care from December 1 onward.
In view of the foregoing it would be entirely inappropriate to attempt on this appeal to determine the merits of this controversy, whether it be considered as based upon the prior divorce suit or the presently pending common law action. The pending common law action should go forward and be determined in accordance with the principles heretofore stated unless plaintiff elects to amend her motion in the *122 matrimonial cause to allege and attempt to prove facts establishing the jurisdictional requirements discussed above.
We find it unnecessary to pass upon the remaining points raised.
Reversed. No costs.